**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

KENNETH EACRET,
JANET TRAWICK,
ARNALDO MENDINUETA,
and CARISSA KING,
on behalf of Plaintiffs and the class
members described herein,

Plaintiffs,

v.

PLAIN GREEN, LLC;
PLAIN GREEN SPV 1, LLC;
RECEIVABLES FUNDING II, LLC;
METASOURCE, LLC;
and JOHN DOES 1-20,

Defendants.

DEMAND FOR TRIAL BY JURY

## COMPLAINT – CLASS ACTION

1. Plaintiffs Kenneth Eacret, Janet Trawick, Arnaldo Mendinueta, and Carissa King ("Plaintiffs") bring this action against Defendants (a) Plain Green, LLC, (b) Plain Green SPV 1, LLC, (c) Receivables Funding II, LLC, (d) Metasource, LLC, and (e) John Does 1-20, to secure redress for usurious and illegal loans (such as Appendices A-D) made to Indiana residents.

2. Plaintiffs seek damages under the Indiana Uniform Consumer Credit Code (Count I) and treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1964 (Count II).

## JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. §1331 (general federal question), 28 U.S.C. §1332(d) (Class Action Fairness Act), 18 U.S.C. §1964 (RICO), 28 U.S.C. §1337 (interstate commerce), and 28 U.S.C. §1367 (supplemental jurisdiction).

4. On information and belief, there are more than 100 class members and the amount in controversy, on a classwide basis, exceeds $5 million, exclusive of interest and costs.

5. This Court has personal jurisdiction over Defendants because they:

a. Knowingly participated in the making and collection of unlawful loans to Indiana residents. In similar actions against purported "tribal" lenders, courts have held that personal jurisdiction over the persons involved in making the loans exists in the state where the borrower obtained a loan via the Internet, and in which loan funds were disbursed via ACH transfer. *Gingras v. Rosette*, 5:15cv101, 2016 U.S. Dist. LEXIS 66833, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016)*, aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lending entity's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law, including state usury laws and RICO, where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello,* 18cv12277, 2022 U.S. Dist. LEXIS 58075, at *33-34, 2022 WL 952183 (D. Mass. Mar. 30, 2022); *Dawkins v. Blue Dart Ventures,* 8:20cv2353, 2021 U.S. Dist. LEXIS 130297 (M.D. Fla. Apr. 1, 2021).

b. Selected which states to offer loans in, thereby targeting those states. *Illinois v. Hemi Group, LLC,* 622 F.3d 754, 760 (7th Cir. 2010).

6. Venue is proper because acts to obtain and collect the loans impacted Plaintiffs in Indiana.

7. Article III is satisfied because actions for statutory damages and invalidation of loans for usury were entertained by the courts of England and the United States in 1787. English Usury Act of 1713, 12 Anne Session 2 c. 17. All thirteen original American states replaced the English usury statutes with their own usury laws between 1641 and 1791. Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits*, 92 Minnesota Law Review 1110, 1116-18 (April 2008), summarizing statutes allowing 5% to 8% interest.

**PARTIES**

8. Plaintiffs are citizens of Indiana who resided as follows:

a. Kenneth Eacret – Indianapolis, Indiana.

b. Janet Trawick – Indianapolis, Indiana.

c. Arnaldo Mendinueta – Indianapolis, Indiana.

d. Carissa King – Indianapolis, Indiana.

9. Defendant Plain Green, LLC is a limited liability company purportedly organized under the law of the Chippewa Cree Tribe of the Rocky Boy's Reservation in Montana. It uses the following addresses:

a. P.O. Box 42560, Philadelphia, PA 19101;

b. c/o Metasource, 1900 Frost Road, Suite 100, Bristol, PA 19007;

c. 93 Mack Road, Suite 600, Box Elder, MT;

d. P.O. Box 270, Box Elder, MT 59521;

e. 8901 E. Pima Center Pkwy., Ste. 21, Scottsdale, AZ 85258-4446.

10. Defendant Plain Green SPV 1, LLC is a limited liability company. It uses the address 93 Mack Road, Suite 500, Box Elder, MT.

11. Defendant Receivables Funding II, LLC is a limited liability company. Its registered agent and office is Vcorp Services, LLC, 108 West 13th Street, Suite 100, Wilmington, DE 19801. It uses the address 44 South Broadway, 11th floor, White Plains, NY 10601-4411.

12. Defendant Metasource, LLC is a limited liability company organized under Delaware law. It has offices at 1900 Frost Road, Suite 100, Bristol, PA 19007. Its registered agent and office is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. It provides document processing and process management solutions.

13. John Does 1-20 are other natural or artificial persons who participated in the Internet lending scheme complained of herein.

## FACTS

## FACTS RELATING TO INTERNET LENDING BUSINESS

14. Defendant Plain Green, LLC makes loans to residents of Indiana and other states over the Internet, using the website https://www.plaingreenloans.com/. (Appendix E)

15. Plain Green SPV 1, LLC holds a security interest in consumer loans made by Plain Green, LLC and all proceeds thereof (Appendix F), pursuant to a Master Consumer Loan Purchase Agreement dated as of December 1, 2017.

16. Receivables Funding II, LLC holds a security interest in all assets of Plain Green SPV 1, LLC (Appendix G), pursuant to a Master Loan and Security Agreement dated December 5, 2017.

17. On information and belief, Receivables Funding II, LLC funds the loans made in the name of Plain Green, LLC, which are promptly transferred to Plain Green SPV 1, LLC.

18. Defendant Metasource, LLC actually services and receives payment of the loans.

19. The actual lending operations were and are carried out in locations other than tribal lands.

20. The funds lent are transferred by ACH credit to the borrowers' respective bank accounts throughout the United States.

21. Repayment of the loans is made by ACH debit from the borrowers' respective bank accounts throughout the United States.

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

22. An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

23. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the

amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

24. The test must be applied to exclude sham "tribal lending entities." As explained in *Ransom v. Greatplains Fin., LLC*, 2025 U.S. App. LEXIS 19539, *11-13, 148 F.4th 141:

> . . . But we find it less useful to think up post hoc policy rationales and more helpful to focus on why courts recognized the immunity in the first place: to respect the tribe's governance and to protect its treasury. Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe, 498 U.S. 505, 509 (1991) (explaining that immunity respects tribes'"inherent sovereign authority"); Breakthrough, 629 F.3d at 1183 (noting that one rationale for immunity was to protect tribes' treasuries). Respecting the tribe's sovereignty corresponds to factor (3): A suit against an entity drags the sovereign into court only if the entity is under the sovereign's control. And protecting the tribe's treasury maps on to factor (5).
>
> Between those two factors, the effect on the tribe's treasury may matter more. That factor is the core of sovereign immunity, shielding the fisc so governments can decide whether to spend finite funds on healthcare, education, pensions, or satisfying individual legal claims. Richard H. Fallon, Jr., Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 915, 937 (1988) ("[S]overeign immunity rests on the assumption that ... the government should be able to weigh for itself whether submission to a traditional lawsuit would harm or promote the public interest."); Alden v. Maine, 527 U.S. 706, 750 (1999) ("Private suits against nonconsenting [sovereigns] ... may threaten [their] financial integrity ...."). So in the analogous context of suits against government officers, courts decide whether a suit is really against the sovereign by looking at whether a judgment would hit the public coffers. Dugan v. Rank, 372 U.S. 609, 620 (1963); Edelman v. Jordan, 415 U.S. 651, 663 (1974). Sovereign immunity is really immunity for the sovereign's treasury, so how a judgment would affect tribal finances may merit the most weight.
>
> In cases like this one, any tribal-immunity test regrettably must also serve another purpose: separating true arms of the tribe from shams. Unscrupulous lenders can seek out tribes to pose as figureheads, hide behind their sovereign immunity, and break state law scot-free. Unfortunately, these rent-a-tribe schemes do happen. Jayne Munger, Note, Crossing State Lines: The Trojan Horse Invasion of Rent-a-Bank and Rent-a-Tribe Schemes in Modern Usury Laws, 87 Geo. Wash. L. Rev. 468, 478-79 (2019). To reserve tribal sovereign immunity for tribal sovereigns, our test must sift out impostors.
>
> That may mean putting less weight on factors (1), (2), and (4). Whenever a non-tribal business gets a tribe to pose as a figurehead, both (1) and (4) will be met: The parties may be sure to incorporate the business under tribal law and to note the tribe's intent to extend it sovereign immunity. As for factor (2), the entity's purpose, it may be easy to dash off a document reciting that the business's purpose is helping a tribe. See People ex rel. Owen v. Miami Nation Enters., 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357, 376, 378 (Cal. 2016) (even though firm's articles of incorporation listed purpose to help tribe, the "vast majority" of its revenue went to non-tribal partners). True, the other half of factor (2), how

> much the business serves that stated purpose, may prove relevant. And it can be revealing if an entity flunks any of these factors. But because these factors may come out identically for true tribal arms and for shams, we do not find it very informative when these easily checked boxes are checked easily.
>
> We thus apply the Breakthrough factors, emphasizing substance over form. At least on these facts, we pay particular attention to (3) and especially to (5). On each factor, GreatPlains bears the burden of showing that it favors immunity. Bowers v. NCAA, 475 F.3d 524, 546 n.25 (3d Cir. 2007).

25. An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

26. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

27. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

28. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

29. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States*

*v. Grote*, 961 F.3d 105 (2d Cir. 2020).

**DEFENDANTS' LOANS**

30. Loans were made in the name of Plain Green, LLC to Plaintiffs as follows:

| Plaintiff | Appendix | Date | Principal | Disclosed annual percentage rate |
|---|---|---|---|---|
| Kennth Eacret | A | Sept. 22, 2025 | $1,000 | 690.42% |
| Janet Trawick | B | June 4, 2024 | $1,000 | 693.16% |
| Arnaldo Mendinueta | C | June 5, 2025 | $700 | 690.87% |
| Carissa King | D | July 22, 2025 | $1,250 | 597.36% |

31. The loan agreements are standard forms.

32. The loans were made for personal purposes and not for business purposes.

33. The loans were made entirely via the Internet.

34. The principal amounts were transferred to Plaintiffs' respective bank accounts in Indiana via ACH.

35. The loan was to be repaid via ACH.

36. Plaintiffs made some of the payments, including interest.

37. Defendants' lending does not actually occur on the Tribe's reservation.

38. A significant majority of the transaction occurs within the State of Indiana—applying for the loan and receiving and collecting the funds.

39. The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

40. Plaintiffs have never set foot on the Tribe's land.

41. Loans to Indiana residents made in the same manner as the loan to Plaintiffs are

governed by the laws of the State of Indiana.

## INDIANA REGULATION OF LENDING

42. The Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-201, establishes a maximum loan finance charge of 36% per annum for consumer loans other than supervised loans.

43. For loans other than supervised loans, Ind. Code § 24-4.5-3-201 provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

44. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.
>
> (2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:
>
> > (a) the total of:
> >
> > > (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;
> > >
> > > (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
> > >
> > > (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or
> >
> > (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

45. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 *et seq*., but it does not authorize Defendants' rates, and requires that small loans conform to other requirements

that Defendants' loans do not comply with.

46. Ind. Code. § 24-4.5-7-201, "Limitations on finance charges," provides:

> (1) Finance charges on the first two hundred fifty dollars ($250) of a small loan are limited to fifteen percent (15%) of the principal.
>
> (2) Finance charges on the amount of a small loan greater than two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400) are limited to thirteen percent (13%) of the amount over two hundred fifty dollars ($250) and less than or equal to four hundred dollars ($400).
>
> (3) Finance charges on the amount of the small loan greater than four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550) are limited to ten percent (10%) of the amount over four hundred dollars ($400) and less than or equal to five hundred fifty dollars ($550).
>
> (4) The amount of five hundred fifty dollars ($550) in subsection (3) is subject to change under the provisions on adjustment of dollar amounts (IC 24-4.5-1-106). However, notwithstanding IC 24-4.5-1-106(1), the Reference Base Index to be used under this subsection is the Index for October 2006.

47. The amount of finance charge provided for in Appendices A-D is more than double that permitted in Indiana under any provision.

48. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

> (1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .
>
> > (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.
> >
> > (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.
> >
> > (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.
> >
> > (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a

creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

(a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and

(b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

(a) An agreement that the law of another state shall apply.

(b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.

(c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

49. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and ***if the debtor has paid an excess charge the debtor has a right to a refund***. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) ***If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the***

> ***amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.*** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .
>
> (7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.
>
> (8) In any case in which it is found that a creditor has violated this Article, the court may award ***reasonable attorney's fees*** incurred by the debtor. . . . (Emphasis added)

50. The excessive interest charges imposed by Defendants were willful. Plain Green, LLC settled similar claims in 3:17cv495 (E.D.Va.) in December 2019. In 2020, Plain Green, LLC was warned by the Washington State Department of Financial Institutions that its continued lending activities were illegal. (Appendix H)

**COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE**

51. Plaintiffs incorporate paragraphs 1-50.

52. This claim is against all Defendants.

53. Because the loan made to Plaintiffs violated the rate limits set by Indiana law, and the violation was intentional, Plaintiffs and other borrowers are entitled to ten (10) times the amount of the excess charge.

**CLASS ALLEGATIONS**

54. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

55. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Plain Green, LLC at more than 36% interest (all of its loans qualify) (c) on

or after a date two years prior to the filing of this action.

56. Plaintiffs may alter the class definition to conform to developments in the case and discovery.

57. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

58. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

59. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

60. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

61. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants for:

i. Statutory damages;

ii. Attorney's fees, expenses and costs; and

iii. Such other or further relief as is appropriate.

**COUNT II – RICO**

62. Plaintiffs incorporate paragraphs 1-50.

63. This claim is against Plain Green SPV 1, LLC, Receivables Funding II, LLC, Metasource, LLC, and John Does 1-20, who are the RICO "persons."

64. All loans made in the name of Plain Green, LLC to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

65. The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

66. Plain Green, LLC is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

67. Defendants Plain Green SPV 1, LLC, Receivables Funding II, LLC, Metasource, LLC and John Does 1-20 are associated with this enterprise.

68. Defendants Plain Green SPV 1, LLC, Receivables Funding II, LLC, Metasource, LLC and John Does 1-20 conducted or participated in the conduct of the affairs of Plain Green, LLC through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. §1962(c).

69. Plaintiffs were deprived of money as a result.

## CLASS ALLEGATIONS

70. Plaintiffs bring this claim on behalf of a class.

71. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of Plain Green, LLC at more than 36% interest (all of its loans qualify) (c) which loan was made on or after a date 4 years prior to the filing of suit.

72. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least forty class members.

73. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

a. Whether the loans at issue are "unlawful debts" as defined in RICO.

b. Whether Plain Green LLC is an "enterprise."

c. Whether Defendants Plain Green SPV 1, LLC, Receivables Funding II, LLC, Metasource, LLC and John Does 1-20 are associated with the enterprise.

d. Whether Defendants Plain Green SPV 1, LLC, Receivables Funding II, LLC, Metasource, LLC and John Does 1-20 conducted or participated in the affairs of Plain Green, LLC through a pattern of making and collecting unlawful loans.

74. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer credit litigation.

75. Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

76. A class action is superior for the fair and efficient adjudication of this matter, in that:

a. Individual actions are not economically feasible.

b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiffs and the class and against Defendants Plain Green SPV 1, LLC, Receivables Funding II, LLC, Metasource, LLC and John Does 1-20 for:

i. Treble damages;

ii. Attorney's fees, litigation expenses and costs of suit; and

iii. Such other or further relief as the Court deems proper.

*/s/Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Dulijaza (Julie) Clark
Alexandra Huzyk
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1800
Chicago, IL 60603-1841

(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com
Dedelman@edcombs.com
jclark@edcombs.com
ahuzyk@edcombs.com

**JURY DEMAND**

Plaintiffs demand trial by jury.

*/s/Daniel A. Edelman*
Daniel A. Edelman

**NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*/s/Daniel A. Edelman*
Daniel A. Edelman

## DOCUMENT PRESERVATION DEMAND

Each Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, class members, the events described herein, any third party associated with any telephone call, campaign, account, loan, sale or file associated with Plaintiff, and any account or loan or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

T:\42029\Complaint (5 plaintiffs)_.wpd